**UNITED STATES of America ex rel. David TYRRELL**

v.

**Glen R. JEFFES.**

**Civ. A. No. 74–1830.**

United States District Court,
E. D. Pennsylvania.

Sept. 16, 1976.

Walter J. Collins, Jr., Philadelphia, Pa., for plaintiff.

John G. Siegle, Asst. Dist. Atty., Stephen J. McEwen, Jr., Dist. Atty. of Delaware County, Media, Pa., for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

Relator, David Tyrrell (Tyrrell) has filed his petitioner for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. He has been, and continues to be confined in the State Correctional institution at Graterford (Graterford), where he is serving a sentence of twelve and one-half to twenty-five years, imposed by the Court of Common Pleas for Delaware County, Pennsylvania, after his conviction by a jury on October 9, 1970.[1] Disposition of this matter calls for an analysis of the ensuing issues which we will discuss.

---

1. *Commonwealth v. David Tyrell* [sic], Nos. 101–08 (C.P.Delaware County, Pennsylvania, Criminal Division, March Sessions, 1970).

## I. JURISDICTION AND VENUE

Tyrrell alleged several bases for the granting of the writ. Some of these were dropped prior to, or at the evidentiary hearing which we held. Two principal contentions remain: (1) matters relating to the alleged constitutional infirmities in relator's identification, and (2) points relative to his allegations that his court-appointed counsel was incompetent, both in his handling of the pretrial proceedings and in the conduct of the trial itself. (See Revised Requests for Findings of Fact and Conclusions of Law in Behalf of Relator, at 2–3). Our review of the state court record which includes the opinion of the state court trial judge on post-trial motions, briefs of the parties (pro se by relator), the per curiam affirmance by the Superior Court of Pennsylvania, and the Pennsylvania Supreme Court's denial of the petition for allowance of appeal, satisfies us that every issue raised in the instant case by petitioner was raised in his direct appeals before the appellate courts of the Commonwealth. Accordingly, we find that petitioner has exhausted State remedies as required by 28 U.S.C. §§ 2254(b). This is true, even though relator failed to invoke collateral State procedures. Brown v. Allen, 344 U.S. 443, 448–49, n. 3, 73 S.Ct. 397, 97 L.Ed. 469 (1953); United States ex rel. Bennett v. Rundle, 419 F.2d 599 (3d Cir. 1969). Venue lies here; both the situs of the trial was, and the place of his detention is located in the Eastern District.

## II. HISTORY OF THESE PROCEEDINGS

Mr. Tyrrell filed his petition pro se, and in forma pauperis. After receipt of the recommendation by the United States Magistrate, we reviewed the file, determined that an evidentiary hearing was required, and appointed counsel to represent relator (Order of November 27, 1974). Time frames for (1) completion or discovery, (2) submissions of briefs, (3) a final pretrial order, and (4) the final pretrial conference were established. The evidentiary hearing was conducted over the course of several days in order to permit relator's counsel to conduct further discovery with respect to matters raised during the course of that hearing. We have reviewed the record of the proceedings before us, the state court records, and all briefs and memoranda submitted by the parties. We conclude, on the basis of the entire record, that relator's petition is without merit; accordingly, the writ of habeas corpus will be denied.

Our reasons follow:

## III. FACTS RELATING TO THE CRIMINAL CONDUCT CHARGES

A brief recitation of the incidents which led to the charges is necessary in order to provide the proper perspective for our determination of the factual issues which are critical in reaching an ultimate decision. In the early hours of the morning of December 20, 1969, two men, one black and one white, robbed the Media Motor Lodge, near the intersection of Baltimore Pike and Providence road in Media, Delaware County, Pennsylvania. While the robbers were inside the Lodge, Corporal George Weaver of the Media Police Department, observed an empty 1958 Chevrolet with its engine running, bearing Pennsylvania license registration OM 1307, at rest in the Lodge parking lot. A radio check was made, without any conclusive results. Thereafter, Corporal Weaver tried to locate the night clerk (who could not be found, since he was bound and gagged in the basement), and checked for signs of illegal entry. As he approached a stairway leading from the carport to a basement entrance to the ballroom, he observed two men, one black and one white, exiting from the door located at the bottom of the stair. The two continued up the stairs, and passed the police officer, without saying a word or responding to his questions. Then the white man wheeled about and shot Weaver once below the left ear. The man who shot Weaver ran to the vehicle, entered it, and headed East on Baltimore Pike, while the other individual fled into the bushes behind the Lodge. Weaver, bleeding but conscious, went to his patrol car, radioed the message that he had been shot,

and stated that his assailant had fled East on Baltimore Pike in the same vehicle which had been the subject of his radio inquiry. However, the gravity of his injuries prevented him from pursuing the Chevrolet.

Officers from surrounding communities were dispatched to the Lodge to assist Weaver, and to stake out the area. One of them, Officer Robert West, spotted a vehicle which fit the radioed description, and gave chase. Relator was the driver of that automobile. Officer West stated at the trial that the Chevrolet stopped near an intersection, presumably in response to West's flashers; he left his patrol car and started to walk to the driver's door, when the suspect vehicle began to move. He thereupon fired three rounds from his shotgun into the Chevrolet, which then continued slowly to the left, across Baltimore Pike, and finally came to rest on the apron of a Mobil gas station on the north side of the Pike. Officer West was thereafter joined by other officers, who then approached Tyrrell. Relator grabbed for the revolver of one of the officers, and a short but violent scuffle ensued. Several blows were landed before Mr. Tyrrell was subdued. He was strapped to a stretcher to prevent further resistance, and put in a patrol wagon for the trip to the Media police station. Immediately upon arriving there, Tyrrell was sent to Riddle Memorial Hospital, so that Corporal Weaver, who had been taken there for treatment, could view him. He was identified by Weaver in the one-to-one showing, after which he was returned to the police station. He was later taken back to the hospital, where he was confined for treatment of injuries received in the scuffle with the police.

Some time later, after Weaver left the hospital, but before trial, Chief Bruton of the Media Police showed Weaver several photographs of Tyrrell taken from him on the morning of his arrest. It is undisputed that neither Tyrrell nor his counsel, David Auerbach, Esq., of the Public Defender's Office in Delaware County, were present on that occasion.

Motions to suppress the photographs, the show-up identification, and all of Weaver's identification, including in-court statements, were filed on Tyrrell's behalf. The photographs were suppressed on the basis of the impropriety of the means by which they were obtained, but Corporal Weaver was permitted to testify in court as to his independent identification of Tyrell. A three-day trial before a jury resulted in guilty verdicts on fourteen counts charging, *inter alia,* burglary, larceny, robbery, aggravated and other assaults upon civilians, assault and battery upon police, and two weapons charges. He was acquitted of assault with intent to kill.

There were two robbers at the Media Motor Lodge, but only Tyrrell was charged and tried. Evidence was presented at the trial which established that one Luther Jones had been picked up near the Motor Lodge at approximately the same time Relator was seized, but had died of a heart attack just after the start of his interrogation by the police.

## IV. THE ISSUE OF IDENTIFICATION

Relator contends that the hospital identification was improper under the circumstances, and deprived him of his due process rights, because it was suggestive, conducted in the absence of counsel, post-arrest, and generally improper. We cannot agree.

### A. The Controlling Legal Precepts

A trio of Supreme Court cases have established the guidelines which govern lineup and identification procedures. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In response to the dangers to the fact-finding process which were generated by highly suggestive lineups, the Court in *Wade* and *Gilbert* wrote a prospective *per se* rule—a lineup identification at which the accused was present without counsel would not be admitted into evidence. *Wade, supra,* 388 U.S. 237, 87 S.Ct. 1926. However,

while the circumstance of the identification itself would be inadmissible, the witness who actually identified the defendant would in the proper case, be permitted to testify as to the fact of that identity at the trial. The test of propriety was that adopted previously in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), which also dealt with the question of admissibility of potentially tainted evidence. In *Wong Sun,* the court held that the government must show by clear and convincing evidence that the in-court identification had an independent basis separate and apart from the improper lineup identification. *Wade, supra,* 388 U.S. at 240–41, 87 S.Ct. 1951. Among the factors to be considered in coming to a determination are: (1) the witness' prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any pre-lineup description given to police by the witness, and the accused's description; (3) any identification by that witness of another person prior to the lineup; (4) the witness' failure to identify the defendant on a prior occasion; (5) the lapse of time between the alleged act, and the lineup identification; and (6) any other prejudicial factors about the conduct of the lineup identification which are disclosed. *Id.* at 241, 87 S.Ct. 1951. In short, is there an independent basis for the in-court identification?

*Stovall* presented a somewhat different problem. The case arose on a petition for a writ of habeas corpus. The show-up had occurred prior to the *per se* rule of *Wade-Gilbert.* However, there was still an evaluation to be made of the possible improper suggestiveness in the identification proceedings; the Court ruled that consideration was to be based upon traditional due process grounds, *Stovall, supra,* 388 U.S., at 297, 87 S.Ct. 1967, and held that under the facts presented, there had not been a due process violation.

■ One other case is of general importance: *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The basis for the decision is not of clear precedential value, since only four justices joined in the opinion, but there was an additional concurrence in the result, which restricted the *Wade-Gilbert per se* rule to post-indictment lineups. *Thus there is not a general requirement that counsel be present at preliminary show-ups; such identification procedures are to be viewed in conformity with due process guidelines against the backdrop of the totality of all of the circumstances.*

■■ The court in these cases has always tackled the problem in the context of the sixth amendment right to counsel. *Counsel is necessary only at critical stages in the adversary process. See, e. g., Wade, supra,* 388 U.S. at 244–45, 87 S.Ct. 1951. Photographic displays do not rise to such a critical level as to require, *eo ipso,* the presence of counsel, because it is possible to otherwise develop the surrounding circumstances through trial procedures. *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Thus, again, the test for such displays is a due process one which requires a review of the challenged procedures, "in light of the totality of surrounding circumstances". *Simmons, supra,* 390 U.S. at 383, 88 S.Ct. at 970.

The recent decision of the Supreme Court in *Stone v. Powell,* —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), should be noted, even though the principles enunciated are inapplicable to the case at bar, because of a sharp difference in the factors present in the two cases. In *Stone,* the Court held that the Fourth Amendment exclusionary rule is inapplicable to federal habeas corpus review of a state court conviction, absent a showing that the state prisoner was denied the opportunity to fully and fairly litigate his Fourth Amendment claims in the state court trial and on direct review of his conviction. In reaching this conclusion, the Court stated that

Our decision today is *not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally. We do reaffirm that the exclusionary rule is a judicially created remedy rather than a personal consti-

tutional right, see p. ⸺ [96 S.Ct. pp. 3047–3048], *supra,* and we emphasize the minimal utility of the rule when sought to be applied to Fourth Amendment claims in a habeas corpus proceeding. As Mr. Justice Black recognized in this context, "ordinarily the evidence seized can in no way have been rendered untrustworthy . . . and indeed often . . . alone establishes beyond virtually any shadow of a doubt that the defendant is guilty". *Kaufman v. United States,* 394 U.S. 217, at 237, 89 S.Ct. 1068, 22 L.Ed.2d 227 [Black, J., dissenting]. *Id.,* at ⸺, n. 37, 96 S.Ct. at 3052.

■ We are concerned in this matter, however, with lineup and identification procedures; *a crucial factor in our decision with respect to the validity of the procedures utilized, and the admissibility of a subsequent in-court identification, is the reliability and trustworthiness of that identification.* The suppression rule which relator contends should have been applied in his state court trial is not simply a judicially created remedy which excludes evidence obtained by police officers in violation of the Fourteenth Amendment "in the hope that the frequency of future violations will decrease". *Id.,* at ⸺, 96 S.Ct. at 3051. To the contrary, unlike the typical Fourth Amendment argument, asserted by way of collateral attack, the claims raised in this case have a direct bearing "on the basic justice of [relator's] incarceration". *Id.,* at ⸺, n. 31, 96 S.Ct. at 3050.

We turn then, to the facts and the circumstances of the identification of relator, in light of these principles.

## B. The Hospital Show-up

■ After Tyrrell was subdued by the police, he was taken in a van to the Media Police Headquarters. He was then taken to Riddle Memorial Hospital, where Corporal Weaver had been sent for treatment. Tyr-

rell stated that he was unconscious, but that he thinks there was a delay of one-half hour before he was taken to the hospital. (T.P. April 14, 1975, 17–19).[2] Officer West testified to a delay of five or ten minutes before the order was given to take him to the hospital. (T.P. April 15, 1975, 92). At the State Court trial, the officers involved testified to a very short delay at the station; none stated that the delay was in excess of a few minutes. (N.T., 272, 296, 306). There was no suggestion made that the suspect could have been arraigned, let alone indicted, during such a short period of time at approximately 6:00 A.M. on a Saturday morning. We hold that the show-up was a pre-indictment event, and thus not subject to the *per se* rule. *Kirby, supra.* See also *Russell v. United States,* 133 U.S. App.D.C. 77, 408 F.2d 1280, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). Accordingly, we will apply due process standards to evaluate the propriety of the early-morning one-on-one showing.

*Stovall* itself gives us significant guidance in this regard. The witness in that case was the survivor of a murder and attempted murder, and, in fact, was the only person alive who had seen the assailant. She had been seriously wounded with multiple stab wounds during the attack, and was in the hospital recovering from surgery in order to save her life, when the police apprehended a suspect. Flanked by police, he was brought to her hospital room; she identified him then and there. The Court found no due process infirmity on the basis of these facts. It noted particularly that the confrontation was in the hospital, that the hospital was near the jail, that no one knew how long the witness would survive, that she was physically unable to go to the jail, that an immediate identification was necessary to determine whether the investigation should be continued, that the usual lineup format was out of the question, and that the victim was the only per-

---

**2.** "N.S.H." refers to the notes of the first suppression hearing before the state court on March 26, 1970. "N.T." refers to notes of the trial in the state court on October 7–9, 1970. The transcripts of proceedings before this

Court on the petition for a writ of habeas corpus will be identified by the initials "T.P." and the date of the particular hearing. All other materials will be designated by their full description.

son alive who could say that the suspect was *not* her attacker. *Stovall, supra,* 388 U.S. at 297, 87 S.Ct. 1967. The Court did not emphasize, but we note for comparison that the show-up was the day after surgery, twenty-four hours after the arrest, and three days after the crime. Moreover, the suspect had not yet retained counsel, and the witness was asked directly whether the suspect " 'was the man.' " *Id.* at 295, 87 S.Ct. 1967.

Several other "one-on-one" identification cases are noteworthy. In *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), the Supreme Court overturned a state conviction involving identification. The witnesses had seen a highly suggestive lineup (pre-*Wade*), but had not made any firm identification. Thereafter, each was confronted individually with the accused, but all of them were uncertain as to identification. It was only after a third lineup that solid identification was made. Applying the *Stovall* "totality of the circumstances" test, it was found wanting.

In contrast, several District of Columbia Circuit cases have upheld immediate "one-on-one" confrontations. *Russell v. United States, supra,* recognized the possible suggestiveness of the procedure, but held that this factor was outweighed by the reliability of immediate confrontation, coupled with the difficulty of obtaining counsel, and other lineup participants at 5:00 A.M. *United States v. Evans,* 141 U.S.App.D.C. 321, 438 F.2d 162, *cert. denied,* 402 U.S. 1010, 91 S.Ct. 2196, 29 L.Ed.2d 432 (1971), involved a showing thirteen days after the crime, but only minutes after the victim had spotted her assailant on the street, and had called in his description and the place where she had observed him. The court said in essence that good police work required immediate verification by the apprehending officer in order to establish that this person was the correct suspect. *But see McRae v. United States,* 137 U.S.App.D.C. 80, 420 F.2d 1283 (1969) (identification of suspect in a police car held improper when there was no showing that the victim-witness was in danger

of death, or could not attend a normal lineup).

■ In the instant case, we are confronted with a situation in which a police officer had been shot in the head while investigating a robbery. He was alive and in the hospital; his physical condition, however, was not yet ascertained. (N.S.H. 14, 24–25; T.P. April 15, 1975, 95). It was early morning, approximately 6:00 A.M. on a Saturday. (N.S.H. 12; T.P. April 15, 1975, 92; *see also* copies of hospital records, which establish that Weaver was brought in at 5:30 A.M.). It would be crucial to know whether the suspect, whose only connection with the crime was Weaver's radioed description of the vehicle, was in fact the assailant, in order to enable the police to decide whether to continue the investigation. Any delay for the purpose of obtaining participants for a regular lineup would have been excessive, particularly given the hour, and the day. It would have been difficult to obtain counsel at that moment, and the officer could not have been expected to be able to attend a lineup in his physical condition. Moreover, the uncertainty of his physical condition was another legitimate factor to be weighed in deciding upon the procedure which was adopted.

Tyrrell testified at the hearing that the exchange at the hospital was as follows:

And when the cop brought me in he says, "We got him. We got him, George. We got the bastard that did it. Take a look." George was laying sort of—Mr. Weaver was laying on this side and he rolled over and he looked and he said, "Good" and that's all he said.

(T.P. April 14, 1975, 20). However, Officer West gave a very different version. He and the other officer lifted the litter so that Weaver, who could not move his head, could see Tyrrell.

THE COURT: What did Corporal Weaver say?

THE WITNESS: He said "That's him. That's the man who shot me."

THE COURT: Did anybody prompt him, did anybody ask him: "Is this the man?"

or did anybody suggest anything to him in your hearing?

THE WITNESS: No, sir.

(T.P. April 15, 1975, 95). Officer West's version of events was essentially the same as that testified to by Weaver at the suppression hearing (N.S.H. 14–15), and as that proffered by the officers who testified at trial. It should be noted that all of these witnesses were sequestered at the trial (N.T. 38), and also at the proceedings before us, with the exception of Officer West. (T.P. April 14, 1975, 12–13). We also note that we were not at all impressed with the credibility of Tyrrell, whose answers to questions appeared to be tailored to construct a fabric which he thought would be appealing. It was not. We find the testimony of Officer West credible in all respects as to the conduct of the show-up. Therefore this "one-on-one" showing, under the totality of all of the circumstances, including the time, the place, the nature of the incident and the circumstances of apprehension of a suspect, does not contravene generally accepted standards of due process.

### C. Taint of the In-Court Identification

 Our finding negates the need to consider any possible taint due to the hospital identification. However, we must still consider the photographic display. The actual photographic identification was suppressed before trial, so we need not consider its propriety. Rather, we must focus on whether there was an independent basis for the in-court identification. *Wade, supra,* 388 U.S. at 240–42, 87 S.Ct. 1951. This issue was exhaustively developed and subjected to searching examination both at the suppression hearing and at trial. *See, e. g.,* N.S.H. 16–23; N.T. 152–70, 175–80, 190, 200. The testimony established that, while it was dark, the area near the carport was lit, and there were lights in the carport, and at the top of the stairway. (N.S.H. 17; N.T. 159–62). Corporal Weaver could see the two men quite distinctly. (N.S.H. 7). He had at least a few minutes to observe them, from a good vantage point. He was shot when he was only a few feet away

from his assailant. Weaver convincingly said the following at the suppression hearing:

Q And on what basis did you say that was the man?

A As I said before, this is something, sir, I will never forget. The instant that I saw this man coming up the steps, the profile, his hairline, his complexion and clothing at the time; and then also at the other incident when he shot me I had a very good look at him then, the instant when he shot me.

(N.S.H. 15). Nothing in the record demonstrates any improper motive to identify the wrong man. To the contrary, we would anticipate that a police officer, who must continue to work in the same area, would have a pervasive interest in the apprehension of his actual assailant. The record before us conclusively establishes an independent basis for Corporal Weaver's in-court identification of relator. Nothing has been presented to us to undermine the vitality of that finding. Accordingly, petitioner cannot be accorded any relief on that score. *See* 28 U.S.C. § 2254(d)(3).

### V. THE CALIBER OF LEGAL REPRESENTATION BY RELATOR'S COUNSEL

 In a criminal trial the accused is entitled to the assistance of counsel in his defense. U.S.Const. Amendment VI. This principle is applicable in state, as well as federal proceedings. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799 (1963). Moreover, the quality of representation, which is required in order to meet the constitutional standards mandated, must be effective and competent, and not merely perfunctory, or charade-like in character. *Powell v. Alabama,* 287 U.S. 45, 68, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932). While the Supreme Court has not articulated more precise guidelines with respect to the quality of representation which is required in order to meet due process and fourteenth amendment standards, various courts of appeals have done so. Several courts still follow the narrow "mockery of

justice" standard. *See, e. g., McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974). The Third Circuit, however, along with the Fourth, Fifth and District of Columbia Circuits, has taken a stricter view of the minimal standard of the quality of representation which must be provided. *McQueen, supra*, at 214. The requirement in the Third Circuit is reasonable competency. This precept was first enunciated in *Moore v. United States*, 432 F.2d 730, 737 (3d Cir. 1970), overruling *United States ex rel. Carey v. Rundle*, 409 F.2d 1210 (3d Cir. 1969), *cert. denied*, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970), and *United States ex rel. Darcy v. Handy*, 203 F.2d 407 (3d Cir. 1953) ("farce or mockery of justice"). *See United States ex rel. Green v. Rundle*, 434 F.2d 1112 (3d Cir. 1970). *See also United States ex rel. Navarro v. Johnson*, 365 F.Supp. 676 (E.D.Pa.1973). The inquiry does not go simply to the level of competency, since even when there is normally competent representation there may be errors on the part of counsel. Rather, the inquiry is whether the errors, if any, were in fact, egregious and prejudicial. *United States ex rel. Green v. Rundle, supra*, at 1113.[3]

■ Relator has employed a shotgun approach in attacking his counsel's conduct of pretrial preparation and of the trial itself. Realizing that the bare record of the state court proceedings might not reveal the critical details of counsel's performance, we received testimony from Tyrrell and from his court-appointed attorney, David Auerbach, Esq. We also offered Tyrrell the use of the Court's subpoena power in order to obtain witnesses and records, and we heard from several witnesses called by relator. On the basis of the record before us, we find that he has failed to establish either that his counsel was below the level of reasonable competence, or that he was prejudiced as a result of the alleged errors and omissions committed by his attorney. Hence, his prayer for relief on this score will be denied.

A *seriatim* review of the points raised by relator follows:

### A. Pretrial Actions

#### 1. Absence of Notice to Relator of the Character and Method of Selection of the Grand Jury

■ Tyrrell complains that his attorney failed to notify him before trial of the composition of the grand jury that indicted him. He says that, without notice, he was unable to exercise his right under Pennsylvania Rule of Criminal Procedure 203 to challenge the array. This point was initially raised on October 7, 1970, the first trial day, at which time Tyrrell said that he had not received notice, and his attorney stated that he was surprised to learn this, because his office had received a copy of the notice. As interpreted by the Supreme Court of Pennsylvania, Pa.R.Crim.P. 203 requires the Commonwealth to notify the accused. *Commonwealth v. Cardonick*, 448 Pa. 322, 292 A.2d

---

**3.** The *Moore* standard is comprehensively set forth in the following passage from the opinion:

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances. The artistry of the advocate is difficult to judge retrospectively because the elements influencing judgment usually cannot be captured on the record. The kaleidoscopic range of possibilities often seems limitless, and it is proverbial that the finest ideas emerge on the way back from the courthouse. The advocate's work, therefore, is not readily capable of later audit like a bookkeeper's. Of course, not all the activity of the advocate has this highly subjective quality. It is possible to examine the sufficiency of his preparation and the adequacy of his knowledge of the relevant law. Review may disclose failures at the trial. All these are matters which will inform the judgment on a retrospective inquiry whether counsel adequately performed his duty. But since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case.

*Moore v. United States*, 432 F.2d 730, 736–37 (3d Cir. 1970).

402 (1972). Accordingly, Mr. Auerbach would have had reason to expect that his client had received notice of the pending indictment.

The issue of notice was raised and a motion to quash the indictment was filed by Auerbach on October 7, immediately after the problem came to his attention, at which time the trial judge ruled against relator. (N.T. 21–25). *Lack of notice of the indictment is raised before us as an indicium of counsel's incompetence, and not as an independent, constitutional error.*[4] It certainly was reasonable for counsel to have assumed that the Commonwealth would send notice to the defendant, in light of the receipt of a copy of that notice; because counsel acted upon the information correctly, once he learned of the alleged omission, by filing a motion to quash, we do not find any error in his conduct on this score. The fact that the motion was denied cannot be a basis for stating that he did not act prudently or timely.

### 2. Defective Indictments

Relator contends that several of the indictments were defective because they failed to carry his name; he charges that his lawyer claimed to have reviewed the indictments, as he was obligated to do, and was thus at fault for not raising any objections to these allegedly faulty bills. The *original indictments were included in the state court record which was forwarded to us. We have examined them, and find that on each and every one of them, relator's name is clearly typed in as the defendant.* Obviously, under these circumstances, there was nothing to object to, and counsel's conduct was entirely proper.

### 3. Ballistics Evidence

■ The petitioner developed a theory which, he believed, would clearly demonstrate that he could not have been the person who shot Corporal Weaver, a man who is somewhat taller than he is. (N.T. 8, 11–15; T.P. April 14, 1975, 48). He wrote to several experts in the field of ballistics in order to seek their advice on the possible viability of his theory. He then discussed this thesis with Mr. Auerbach. His complaint before us is that his attorney failed to follow through on this aspect of his defense.

Mr. Auerbach presented his conflict with his client to the trial court before trial. (N.T. 11–15). He described the steps he had taken to Judge de Furia at that time (N.T. 8, 13), and in more detail before us at the evidentiary hearing. (T.P. April 15, 1975, 36–39, 68). His position was that there were too many variables for any expert to testify with any degree of certainty. There was a letter from one expert which stated that proposition precisely. (N.T. 16–17). The trial judge, after listening to Tyrrell himself explain his theory, suggested the extreme narrowness of any possible testimony. Despite Mr. Tyrrell's wish that such expert testimony would exonerate him, we believe that Mr. Auerbach's assessment of the "pros and cons" of this theory was entirely justified. This was a legitimate selection of the trial tactics to be adopted, after analysis of the issues, a choice which we cannot and will not second guess now, long after the fact.

Insofar as the petitioner's complaint is that his counsel did not pursue the leads which he had developed, we find that allegation without merit; indeed, the testimony developed at the evidentiary hearing clearly established that Mr. Auerbach had in fact communicated with one of the experts, and had discussed the entire matter with petitioner. (T.P. April 15, 1975, 36–39, 68).

---

4. We note that no further objections were raised in the post-trial motions, or on appeal (both *pro se*); therefore any error in the failure to give notice to the defendant under Pa.R. Crim.P. 203, if such were to be proved, is waived. *Fay v. Noia*, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Also, unlike *the situation in Commonwealth v. Jones*, 456 Pa. 270, 318 A.2d 711 (1974), there is evidence in this matter which tends to contradict Tyrrell's bare statement that notice of the pending presentment to the grand jury was not sent.

#### 4. Medical Evidence from Riddle Memorial Hospital

█ This aspect of the complaint is two pronged: *First*, that petitioner's counsel failed to examine Tyrrell's hospital records, and to question nurses at the hospital in order to determine his physical condition when he made incriminating statements, and *Second*, that counsel did not check Weaver's records to determine his physical condition when he identified Tyrrell. Relator did not know for a fact that his counsel had not obtained this information, but the lack of a subpoena for the records was suggested as evidence of the omission.

At trial, relator's counsel explained that he had not interviewed the nurses because the statements had been suppressed. (N.T. 30–31). He had checked the hospital records. (N.T. 29; T.P. April 15, 1975, 31). He obtained them a short time after he entered the case, and spent several hours reviewing them. (T.P. April 15, 1975, 32). He did subpoena one of the records, and in fact saw both of them. (T.P. April 15, 1975, 31–35, 63). A copy of the subpoenaed record (of Mr. Tyrrell) was in the attorney's case file. (T.P. April 15, 1975, 32). Based upon this evidence, which we have no reason to question, petitioner's allegations are completely unfounded.

#### 5. Radio Messages

█ The gist of this complaint is that Mr. Auerbach allegedly failed to check the descriptions and other information radioed between the various police officers and the police station on the morning of the incident. He states that he could have impeached the identification testimony, by demonstrating that the police had actually been pursuing someone else when Tyrrell wandered into their net.

Mr. Auerbach was cross-examined on this point at the evidentiary hearing before us. He said that although he had made some check into the information, he had been unable to ascertain the nature of the communications without a subpoena, and that he had made a judgment not to subpoena the material for trial. He did not remember the reason for that decision, but did state he thought that the material verified the officers' statements. (T.P. April 15, 1975, 69–70). Based upon the record before us, we cannot find a justifiable basis for relator's complaint.

#### 6. The Garage Attendant

█ Tyrrell alleged that he knew of a witness to the stop and subsequent scuffle, who could establish that the police version of the incident was substantially different from the actual facts, in that he did not resist the officer, but instead was beaten without cause. The relevance of this to the trial for robbery and assault has not been explained. However, even if we assume that some evidence of value might have been obtained from such a witness, it does not establish Mr. Tyrrell's allegations. To the contrary, it seriously undermines his general credibility. Mr. Auerbach testified before us that he went to the gas station himself and tried to locate witnesses. (T.P. April 15, 1975, 73). No one there knew anything about the incident. Furthermore, while he could not testify with absolute certainty, he did state that he thought that he had learned that the station was closed at the time when Tyrrell was arrested, at approximately 5:00 A.M. on a Saturday morning. (T.P. April 15, 1975, 45–46). Mr. Tyrrell did not produce any evidence to contradict this statement, and when he was offered the subpoena power of this Court to obtain the witness, in order to prove that such testimony could not in fact have been adduced, he declined to avail himself of that opportunity. (T.P. April 15, 1975, 13–20). We need not speculate as to whether Mr. Tyrrell's alibi witness is a mere phantom of a fertile imagination; however, we do find that Mr. Auerbach's conduct of the investigation was entirely proper and competent.

#### 7. The Suppression Hearing

█ The complaint about Mr. Auerbach's conduct of the suppression hearing is quite broad—allegedly it was inadequate. Specifically, Tyrrell avers that his counsel's cross-examination of the witness, Corporal

Weaver, was inadequate, and that he failed to inquire into the reason for the display of photographs.

We have reviewed the transcript of the cross-examination. It appears to us that the weak areas of the identification—possible suggestivity at the hospital, and poor lighting and insufficient time to view the assailant—were thoroughly dissected. Corporal Weaver was, to put it bluntly, unshakeable as a witness. On direct examination he had stated that "this is something, sir, I will never forget." (N.S.H. 15). On cross-examination, he repeated that "there was no question in [his] mind that he was the fellow." (N.S.H. 28). Despite questions concerning the assailant's clothing, the way the suspect was presented to him in the hospital, and his own physical and mental condition, Corporal Weaver stuck to his identification. It is not a mark of inadequate cross-examination to fail to impeach a witness, although this seems to be the thrust of petitioner's complaint.

The matter of the photographs was also reviewed. (N.S.H. 30–39). These were shown to Corporal Weaver *after* the in-hospital identification. (N.S.H. 30). He was handed several photographs by his chief, and he picked out the ones of his assailant. (N.S.H. 32). Objections raised by the prosecutor, and sustained by the Court, precluded Mr. Auerbach from further questioning as to the source of the pictures or the reasons for showing them. (N.S.H. 32–35). On the basis of the information which was obtained at this hearing, the judge decided to suppress all references to the photographs at trial. (Notes of Supplementary Suppression Hearing, March 30, 1970, 5).[5]

In a final effort to impeach Corporal Weaver's testimony at trial, relator's counsel voluntarily raised the question as to a subsequent photographic showing; he was still unable to shake the officer.

After reviewing the transcript of the suppression hearing, and in light of Mr. Tyrrell's failure to produce any evidence which would tend to undermine the presumptions of validity and propriety which attach to that proceeding, we do not find any incompetence in counsel's actions. *See* 28 U.S.C. § 2254(d).

### 8. The Alibi Witness

■ Tyrrell places great emphasis on an alibi to establish that he had been otherwise occupied when the robbery and shooting were committed. The essentials of his alibi defense are that he had been with a woman in her room in the Media Motor Lodge for approximately three-quarters of an hour at the time when the crimes were committed, and that the woman, one "Carol James", would have so testified, if only Mr. Auerbach had tracked her down. (T.P. April 14, 1975, 31–35).[6]

A closer examination of the alibi witness story not only refutes relator's complaints about his attorney's performance, but also is revealing as to the difficulties Mr. Auerbach had in dealing with his client. Tyrrell discussed the possibility of an alibi with his counsel on several occasions before trial. (T.P. April 15, 1975, 41–42, 66–67). However, he never revealed a name or address until October 7, 1970, the first day of the trial. (N.T. 39). Even then, the address was vague and the name was incorrect. (*Id.*). During the preparation for the trial,

---

5. Hence, Mr. Auerbach achieved success on that score. The fact that he was unable to suppress all of the evidence he wished to have eliminated, is hardly a basis for a claim of incompetence. To accept relator's thesis would mean every lawyer who loses a case is incompetent, obviously a tenet that is not even worthy of consideration.

6. In its full scope, as revealed at the evidentiary hearing, the alibi was somewhat more extensive than this. Tyrrell claimed to have been at the Moose Lodge in Chester until it closed at about 4:00 A.M. He had been with two women

there, one of whom variously entitled "Carrie", "Carole James", or "Jane Carroll", took him to her room at the Media Motor Lodge. He spent approximately forty-five minutes with her, while he left his car unlocked and with the engine running. After leaving the woman's room, he entered his car and drove down Baltimore Pike. While on that road, his car had a flat tire, and so he pulled off the road into the gas station, where he was seized and beaten by Officer West and other police. (T.P. April 14, 1975, 32).

Mr. Auerbach had expressed interest in any affirmative defenses which might be available, but his client kept putting him off, saying he would "tell [Auerbach] later. . . ." (T.P. April 15, 1975, 66). When Auerbach did finally learn the name of the alleged alibi witness, it was, in fact, too late, under the rules requiring advance notice of the use of an alibi defense. (N.T. 41). See also Pennsylvania Rule of Criminal Procedure 312. Nevertheless, Mr. Auerbach drove to Chester that night, to the address which he had been given by Tyrrell before the judge, and sought the putative alibi witness. (T.P. April 15, 1975, 42–43). He told Tyrrell of his fruitless search and asked for more information, but none was forthcoming from relator. (Id.). Mr. Auerbach's responses to us are proof positive of his diligence under all of the circumstances.

> THE COURT: Well, excuse me. Did you tell him that you had gone down to look for whoever it was?
>
> THE WITNESS: I certainly did. I certainly did. Never found her.
>
> THE COURT: But he was informed by you of the efforts you made?
>
> THE WITNESS: Judge, in this case I tried to inform of everything, particularly because I thought, quite frankly—there were a lot of difficulties. There were a lot of disagreements as we were going along and I tried to make it clear to him exactly what I thought.

(T.P. April 15, 1975, 43). In stark contrast to Mr. Auerbach's candor and forthrightness Mr. Tyrrell dodged and careened and completely avoided straight answers about his alibi witnesses; while he protested in one breath, that his cause had been prejudiced, in the next he mentioned that he was not going to be put to any further disadvantage, and thus would reveal nothing. (T.P. April 15, 1975, 19).

We will not express any opinion as to the existence of this alibi witness. But we have no doubt that the failure to produce her at Mr. Tyrrell's trial, *if she existed at all, is due solely to the evasiveness of the relator. Whatever doubt there could have been on this score, and we have none, was certainly removed by Tyrrell's refusal to utilize our offer of this Court's subpoena power to aid him in producing the alibi witness at an adjourned hearing before us.* (T.P. April 15, 1975, 16–17). Mr. Auerbach did a competent job of pretrial preparation, despite the "dribs-and-drabs" approach of his headstrong client (T.P. April 15, 1975, 40–41), and he is not to be faulted now for the roadblocks Tyrrell put in his path, roadblocks perhaps that were inevitable if, indeed, facts, if buttoned down, would have established the existence of a phantom, and not a flesh and blood witness.

### 9. Failure to Communicate

■ Mr. Tyrrell made much of his counsel's alleged failure to communicate with him before the trial. As evidence of this, he said that he had not discussed matters in person with his attorney, except on a few occasions, and then only in a most perfunctory manner. (T.P. April 14, 1975, 35–45). He also put into evidence several letters taken from Mr. Auerbach's file. These included two letters from Mr. Auerbach to him, and a half-dozen from Tyrrell to Mr. Auerbach. (T.P. June 20, 1975, 49–51). Finally, relator's counsel at the evidentiary hearing tried to impeach Mr. Auerbach's testimony of meetings and communications on the basis of his statement that Mr. Auerbach had not kept careful notes of all of the time spent and of every interview or meeting. (T.P. June 20, 1975, 53–55).

It is well to recall at this point that Mr. Auerbach was sequestered during the testimony of the other witnesses. This is significant because many of his answers are in complete accord with responses from other witnesses. His recall of events of five years ago was admirable. as were both his honesty and his candor. The significant differences between his versions of meetings, and Mr. Tyrrell's were as to length, topics of discussion, frequency, and scope. Also, Mr. Auerbach was quite clear about the information which he sought and did not obtain from Tyrrell, in contrast to Tyrrell's position that he never received any request from Mr. Auerbach. We find Tyr-

rell's characterization of Mr. Auerbach's preparation completely without merit, even in the absence of contrary evidence, based upon the motions Mr. Auerbach filed, the material reviewed, and the conduct of the trial, as demonstrated by the transcript itself. However, we need not speculate. Mr. Auerbach fully described the meetings he had with Mr. Tyrrell. (T.P. April 15, 1975, 40–41, 57–59; T.P. June 20, 1975, 53–58). He followed up all of Tyrrell's ideas, as expressed in the letters, and informed Tyrrell of the results of his research regularly. (T.P. June 20, 1975, 55, 58). He had a habit of keeping contemporaneous notes, and he produced those notes in court. (T.P. June 20, 1975, 53–55). We find that his credibility is unshaken. We also find that there was not a lack of significant communication, notwithstanding the hurdles erected by relator, and that if he was handicapped in his ability to prepare the case for trial, it did not stem from any lack of responsiveness on his part in following up Tyrrell's suggestions.

### 10. Contention Between Relator and Attorney as to Trial Tactics

 On October 7, 1970, immediately before trial was to commence, Mr. Auerbach took the unusual step of requesting a conference with the judge to air differences on trial strategy between himself and his client. (N.T. 7–10). The attorney made it clear that he did not see any value in several of Tyrrell's suggestions, but that he felt it important to present them to the court, to avoid any possible prejudice to the defendant:

> If the Court please, if I could just add this: The reason I am bringing this up, and a couple of these other things, now, is because of the fact of my position in representing him. *I am only trying to do everything I can to represent his interest.*
>
> However, I am in the position where I disagree with him, or he disagrees with me with regard to certain trial strategy.
>
> If it were a trial case, I would be in a different position, where I could say that I could step out of the case. "If you're

not satisfied with the way I'm handling it, you can pay me for what I did; and I'll step out."

> However, in the Public Defender's case, I am not in a position to do that. The Court may feel that certain things should be done, and that is why I am suggesting it this way.

(N.T. 10) (emphasis added).

Relator seeks to construe this in the same light as the filing of a "no-merit" letter and notice of withdrawal by counsel for the first direct appeal. *See, Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). The situations differ diametrically. In *Anders,* the defendant was forced to proceed *pro se* on appeal when the appellate court refused to substitute another counsel for the one who withdrew. The Supreme Court reversed the conviction, holding that there was a right to counsel for the first statutory direct appeal. In the instant case, counsel continued and conducted himself in an exemplary manner. (see *infra*). At a very early stage, before the judge, and not in the presence of the jury, counsel brought his disagreements into the open, to avoid leaving his client without an opportunity to present his position until after the trial was concluded. To take this out of context and attempt to elevate it to the level of active opposition to his client before the jury, is blatantly false and misleading. There is no merit whatsoever to this aspect of relator's petition.

### B. Conduct of the Trial

#### 1. Failure to Conduct Effective Voir Dire Examination

The conduct of the voir dire examination is governed by Pennsylvania Rule of Criminal Procedure 1107. It may be recorded, but it need not be transcribed with the rest of the record. Therefore, it is not unusual for a reviewing court to be left without a record of the questions put to the jurors, and the responses. That is the situation before us. Relator has attempted to use the bare notation on the record that the voir dire took only two hours to establish that an effective voir dire was not conduct-

ed, because the jurors could not possibly have been questioned individually; hence, he argues that the conduct of the voir dire was far below ordinary standards of competence, and that he was prejudiced thereby, because he was charged with a serious offense committed in a small town against a member of the local police force.

■ As with Mr. Tyrrell's other allegations, the facts developed before us are in stark contrast to the picture he paints. First, we are mindful of the rule of 28 U.S.C. § 2254(d), that state court procedures are presumed to be correct, unless evidence to the contrary is established. Thus, relator must support his allegations by evidence which is stronger than mere ambivalent circumstances. Relator did not present any evidence independent of the testimony of Mr. Auerbach, and his former counsel's testimony ran directly counter to the implications Tyrrell has sought to develop.

■ Mr. Auerbach was not a neophyte when he defended Tyrrell, either in Media generally, or in the Public Defender's office, in particular. In fact, he was the Defender's senior litigator, a veteran of some fifty to sixty trials and one hundred fifty to two hundred guilty pleas. He had been in private practice as well, for several years before joining the Public Defender in a part-time capacity, and handled both civil and criminal matters in his private practice. He estimated that, from his admission in 1963 to the trial in 1970, he tried approximately fifty criminal cases as defense counsel over and above those handled for the Defender's office. (T.P. April 15, 1975, 24–27, 29–30). We have no doubt, when he testified that

I went through the voir dire and I did what I wanted to do on the voir dire and that's all the time that it took.

(T.P. April 15, 1975, 77), that he meant exactly what he said, and that he had the necessary experience to perform the job efficiently and quickly.

In the two hours, he was able to ask questions of each of the thirty-three prospective jurors who were examined. He also had a card prepared in advance of the voir dire, giving name, age, occupation, spouse's occupation, and similar information for each juror. This could be reviewed quickly as each juror went into the box. (T.P. April 15, 1975, 77–80). There is nothing improbable about this, despite relator's present counsel's expressions of disbelief. (T.P. April 15, 1975, 80). Without evidence to the contrary, we must and will adopt Mr. Auerbach's version as accurate. Indeed, it is not at all unusual for intelligent, well-prepared, competent counsel to pick a jury within two hours. Accordingly, we find no merit in relator's contention.

### 2. Advice Not to Testify

■ Mr. Tyrrell apparently believes that the rule in the Commonwealth of Pennsylvania permitting evidence of past convictions to be used for impeachment purposes is ill-advised. *See* Supplemental Brief on Behalf of Defendant in pro se (filed as part of the post-trial motions), at 17–20. Despite his philosophical position on the issue, relator conceded before this Court that he knows it is the law. *See* Memorandum in Behalf of Relator (filed on March 21, 1975). Mr. Tyrrell had a considerable record, as Mr. Auerbach was aware. (T.P. April 15, 1975, 82). If Tyrrell had taken the stand, he would have been faced with that record, and all of the negative connotations which would flow from it. We ourselves were treated at the evidentiary hearing to a prime example of the evasiveness and lack of credibility which must have been anticipated by Mr. Auerbach, as Mr. Tyrrell attempted to deny his record of past-convictions, *after* being confronted with a copy of them. (T.P. April 14, 1975, 53–58). We are not surprised, in view of relator's vagueness and lack of candor before this Court, that an attorney would conclude that Mr. Tyrrell would be a bad witness in his own defense in the trial of the criminal case.

Mr. Auerbach had a second reason for not putting Tyrrell on the stand—he did not then, nor does he yet know what Tyrrell

would have testified to, had he entered the witness box. (T.P. April 15, 1975, 81–82). It would be an unwise attorney indeed who would put any witness on the stand without knowledge of his client's testimony. When that witness is the defendant in a serious criminal case, and when the attorney has not been able to learn what his client's testimony would be, *incompetence would be demonstrated by putting such a witness on the stand.* We find no fault whatsoever in Mr. Auerbach's advice to his client in 1970; to the contrary, under all of the circumstances, it was a sound decision.

## VI. CONCLUSION

The burden is on the petitioner to present evidence substantiating his claim to habeas corpus relief. 28 U.S.C. § 2254(d). Mere allegations are insufficient. *Id.* We gave the relator every possible opportunity to meet that burden. Indeed, we even adjourned the hearings in order to allow him every opportunity to muster any evidence that would be favorable to him. He has utterly failed to meet his burden. He has not shown any infirmity in the hospital identification, or any taint of the in-court identification. Nor has he established that his defense counsel was not reasonably competent, let alone that he was prejudiced by errors and omissions. *United States ex rel. Green v. Rundle,* 434 F.2d 1112 (3d Cir. 1970). To the contrary, the record demonstrates the opposite. Accordingly, his petition must be denied. An appropriate Order will issue.

There is no probable cause for appeal.